UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
M.A., individually and o/b/o her
minor child, W.A.,                    :

          Plaintiffs,           :

     -against-                    :

NEW YORK CITY DEPARTMENT OF           :
EDUCATION a/k/a NEW YORK CITY
BOARD OF EDUCATION, MICHAEL           :
BLOOMBERG, JOEL KLEIN, SUSAN
RAPPAPORT, CLAUDINE                   :
CASSAN-JELLISON, KATRINA CHOI,
GINA DEMETRIOUS, and ELIZABETH        :
MCFADDEN,
                        :

         Defendants.
--------------------------------x

ORDER

and

REPORT AND RECOMMENDATION

10 Cv. 3646 (DAB)(MHD)

**TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

Plaintiff M.A. brings this case on behalf of herself and her disabled minor daughter, W.A., alleging unlawful discrimination in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); and retaliation in violation of the ADA, 42 U.S.C. § 12203; and asserting various state-law claims, including assault and battery, failure to report suspected child abuse, negligent training and supervision of school personnel, and intentional infliction of emotional harm. (See generally Compl.). Plaintiffs premise their claims primarily on the

1

alleged physical mishandling of W.A. by defendant Elizabeth McFadden, the paraprofessional who was assigned to work with W.A. in her first-grade class at the Manhattan School for Children.

The New York City Department of Education ("DOE"), Mayor Michael Bloomberg, former Chancellor of the DOE Joel Klein, Principal Susan Rappaport and Assistant Principal Claudine Cassan-Jellison of the Manhattan School for Children, and teachers Katrina Choi and Gina Demetrious -- collectively, the "City defendants" -- filed a motion for summary judgment seeking to dismiss all claims against them.[1] In the course of briefing, the City defendants have also moved to strike plaintiff's Rule 56.1 Statement. For the reasons that follow, we deny the City defendants' motion to strike but recommend that their summary-judgment motion be granted in full and that the case be dismissed.

---

[1] Pro se defendant Elizabeth McFadden did not move for summary judgment.

2

**FACTUAL BACKGROUND**

**A. New York's Educational Accommodations for Students with Disabilities**

In exchange for receiving federal funds under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., New York State is required to offer a "free and appropriate education" to all children with disabilities who reside in the state and are between the ages of three and twenty-one. 20 U.S.C.A. § 1412; see M.H. v. NYC Dep't of Educ., 685 F.3d 217, 224 (2d Cir. 2012). The IDEA also provides the parents of disabled children with a series of procedural guarantees,

> including the right to examine all records relating to the child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child, written notice prior to any changes in the child's identification, evaluation or educational placement, an opportunity to present complaints with respect to such matters, and, whenever any such complaint is made, the right to an impartial due process hearing by the State educational agency or by the local educational agency, with corresponding rights to be accompanied and advised by counsel, to present evidence and

3

> cross-examine witnesses, to receive a
> written record of proceedings, and to
> receive written findings of fact and
> decisions.

Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 482 (2d Cir. 2002) (internal cites, brackets, quotation marks, and ellipses omitted).

The "centerpiece of the IDEA's educational delivery system" is the individualized education program ("IEP"), Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)) (internal quotation marks omitted), a written plan that is prepared for each disabled child every school year. The plan sets forth, at a minimum: "(1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the child; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with 'nondisabled' peers; (6) the reasons for any alternate assessments; and (7) the start date for recommended services, their duration, and their frequency." M.H., 685 F.3d at 245 (citing 20 U.S.C. § 1414(d)(1)(A); N.Y. Comp. Codes R. & Regs.

tit. 8, § 200.4(d)(2) (2012)). An IEP should be "likely to produce progress, not regression" and should "afford the student with an opportunity greater than mere trivial advancement." Id. at 224 (quoting T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009)) (brackets and ellipses omitted). In addition, the IEP should reflect "the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers,'" taking into account the individual student's academic achievement, learning characteristics, social development, physical development, and behavioral needs. Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(5)); see also N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(a)(1) ("Students with disabilities shall be provided special education in the least restrictive environment").

In New York State, IEPs are developed by local committees on special education ("CSEs"), which are appointed by the board of education or the trustees of the school district. N.Y. Educ. Law § 4402(1)(b)(1); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1) (2012). Each CSE typically includes the disabled student's parent or guardian, one of the student's regular

education teachers and one of his or her special education teachers, a school psychologist, a representative of the school district, a school physician, and another parent of a disabled child from the same or a neighboring school district. See N.Y. Educ. Law § 4402(1)(b)(1).

New York State enables the parents of a disabled child to challenge the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education," 20 U.S.C. § 1415(b)(6), by means of a two-tiered administrative review process. See N.Y. Educ. Law § 4404. Parents may first request a due process hearing before an impartial hearing officer ("IHO"), who is appointed by the local board of education. See id. at § 4404(1)(c); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(c)(1). Either party may subsequently appeal the decision of the IHO to a State Review Officer ("SRO") within the New York State Department of Education. N.Y. Educ. Law § 4404(2); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(k). The SRO's determination is the final administrative decision and may be appealed to a state or federal court within four months of issuance of the decision. N.Y. Educ. Law § 4404(3).[2]

---

[2] During the course of the administrative appeal process, the "pendency provisions of IDEA and the New York State Education Law… require that a student remain in his or her 'then

6

**B. The Facts Underlying Plaintiffs' Claims**[3]

Plaintiff W.A. is a disabled child who has been diagnosed with cerebral palsy and an autism spectrum disorder known as pervasive developmental disorder ("PDD"). (Walsh Decl. Ex. S p. 9). During the relevant period, while W.A. was in kindergarten and first grade, she was non-verbal, not toilet trained, unable to walk, dependent on others for assistance in feeding, and able to stand only with the aid of an external support. (See id. at Ex. S p. 1). Although she was able to spell out single words on an augmentative and alternative communication device ("AAC"), she could not form sentences. (See id. at Ex. S. pp. 2, 12, Ex.

---

current' educational placement, unless the student's parents and the board of education otherwise agree." Arlington Cent. Sch. Dist. v. L.P., 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006) (citing 20 U.S.C. § 1415(j); 34 C.F.R. 300.514; N.Y. Education L. § 4404(4)).

[3] We summarize the facts based on our independent review of the evidence proffered by both parties. As noted below, see infra pp. 24-26, the City defendants filed a motion to suppress plaintiffs' Rule 56.1 Statement and Amended Rule 56.1 Statement, arguing that plaintiffs had repeatedly failed to cite any evidence in support of their factual assertions and had impermissibly relied on hearsay and speculation. (See City Defs.' Mem. in Supp. of Mot. to Strike Pls.' 56.1 Statement 2-5; City Defs.' Reply in Supp. of Mot. to Strike Pls.' 56.1 Statement 6). Rather than become mired in the incidental issue of whether the Rule 56.1 statements accurately reflect the evidence, we have relied only on those few Rule 56.1 statements of fact on which the parties explicitly agree, and have otherwise summarized the facts based on our own review of the proffered evidence. In doing so, we have, nonetheless, borne in mind the parties' arguments as to the admissibility and reliability of various forms of proffered evidence.

Q p. 4). She was easily distracted, had difficulty maintaining focus, could not maintain eye contact, and required constant prompting and reinforcement to engage her in simple interactive and social activities. (See id. at Ex. S pp. 2, 4, 5, 7, Ex. Q pp. 3, 5). In addition, W.A. exhibited impulsive repetitive behaviors, such as slapping herself on the cheek, tapping her fingers (id. at Ex. S pp. 2, 4), and grinding her teeth (see id. at Ex. J pp. 643-44), and she frequently sought sensory stimulation by touching objects and placing them in her mouth. (Id. at Ex. S. p. 4).

W.A. attended the Manhattan School for Children (P.S. 333), a New York City public school, in her kindergarten (2007-to-2008) and first grade (2008-to-2009) years. (City Defs.' R. 56.1 Statement ¶¶ 5, 8; Pls.' Am. R. 56.1 Statement ¶¶ 5, 8). At the start of her kindergarten year, W.A. was classified as orthopedically impaired based on her cerebral-palsy diagnosis.[4] (See Walsh Decl. Ex. Q p. 1). In accordance with her IEP, she was assigned to a mixed kindergarten class, including disabled and non-disabled peers, led by a collaborative teaching team ("CTT") (Pls.' Am. R. 56.1 Statement ¶ 5; City Defs.' R. 56.1

---

[4] Though W.A. had been diagnosed with PDD at some point prior to starting kindergarten, that diagnosis was apparently withdrawn before W.A. first enrolled at the Manhattan School for Children. (See Walsh Decl. Ex. S at 8).

Statement ¶ 5); <u>see</u> N.Y. Comp. Codes R. & Regs. tit. 8 §
200.6(g), consisting of general education teacher Katrina Choi
and special education teacher Gina Demetrious. (<u>See</u> Walsh Decl.
Ex. Q p. 2; Conway Decl. Ex. E p. 10; City Defs.' R. 56.1
Statement ¶ 9; Pls.' Am. R. 56.1 Statement ¶ 9). W.A. also
received seven 30-minute speech therapy sessions, six 30-minute
occupational therapy sessions, and eight 30-minute physical
therapy sessions each week. (Pls.' Am. R. 56.1 Statement ¶ 7;
City Defs.' R. 56.1 Statement ¶ 7). In addition, she received
full-time one-to-one assistance from a health paraprofessional
who assisted in feeding her, changing her diaper, lifting her
into and out of her wheelchair and stander, bringing her to and
from her individualized therapy sessions, moving her around the
classroom and the school, and reinforcing her engagement in
classroom activities. (Conway Decl. Ex. A p. 2, Ex. D p. 11, Ex.
E p. 59).

In May 2008, at the close of the kindergarten year, W.A.'s
CTT teachers, Ms. Choi and Ms. Demetrious, met with W.A.'s
mother, M.A. (<u>Id.</u> at Ex. E pp. 21-22, Ex. N p. 72). They advised
M.A. that, although W.A. had not kept pace with the class
curriculum and had not met the criteria for promotion, they had
nonetheless decided to promote her to first grade because they

9

saw little benefit in requiring her to repeat kindergarten and believed that it was important for her to maintain her social ties to her peers in the class. (See id. at Ex. E p. 22; Walsh Decl. Ex. P pp. 3-4). They also advised M.A. that W.A. appeared to be showing signs of a developmental disability, and they recommended that she be evaluated by an expert. (Pls.' Am. R. 56.1 Statement ¶ 17; City Defs.' R. 56.1 Statement ¶ 17; Conway Decl. Ex. E p. 23).

Based on this recommendation, M.A. had an independent neurodevelopmental evaluation done of W.A. in June 2008. (Walsh Decl. Ex. S p. 1). The examining experts, a pediatrician and a developmental psychologist, diagnosed W.A. with both cerebral palsy and PDD. (Id. at Ex. S p. 12).

## 1. Administrative Review of W.A.'s First Grade IEP

In light of the reported neurodevelopmental evaluation findings, M.A. requested a CSE meeting to discuss how W.A.'s IEP might be modified to better address her special educational needs. (See id. at Ex. P p. 6). Following a CSE meeting on September 24, 2008, the school district issued a final notice of recommendation, dated October 8, 2008, changing W.A.'s

10

classification from an orthopedic impairment to autism. (See Conway Decl. Ex. A p. 7). As recommended in the neurodevelopmental evaluation report (see Walsh Decl. Ex. S p. 9), the proposed IEP also recommended that W.A. be reassigned from the CTT classroom setting to a specialized class in a specialized school. (See Conway Decl. Ex. A p. 7). Despite M.A.'s request at the CSE meeting that W.A. receive applied behavioral analysis ("ABA") services, the school district declined to include such services in the IEP. (See id.).

On October 14, 2009, M.A.'s attorney filed a request for a due process hearing, arguing, among other things, that the school district (1) had predetermined the outcome of the CSE meeting, without allowing M.A. to participate equally in the meeting, (2) had failed to recommend a specific school placement during the CSE meeting, (3) had failed to properly evaluate W.A.'s performance levels in anticipation of the CSE meeting, (4) had given inadequate consideration to the independent neurodevelopmental evaluation, (5) had failed to provide W.A. with the least restrictive educational environment, (6) had failed to propose a plan to help transition W.A. from the CTT setting to her new proposed placement, and (7) had failed to recommend in the proposed IEP a specific staffing ratio,

11

extended school year and extended day services, or parent training services. (Id. at Ex. G). At a meeting on October 23, 2008, M.A. and representatives of the school district reached a partial agreement with respect to several of M.A.'s concerns. (Walsh Decl. Ex. S p. 9; see Conway Decl. Ex. H). M.A.'s remaining concerns were then addressed before an IHO in a six-day due-process hearing, held between December 3, 2008 and May 4, 2009. (Walsh Decl. Ex. S p. 10; Conway Decl. Ex. J pp. 2-3). The IHO's July 6, 2009 decision concluded that the school district had effectively denied W.A. a free appropriate public education by failing to conduct a functional behavioral assessment as part of the IEP-review process, and by failing to include parental training and counseling services in the proposed IEP. (Conway Decl. Ex. J pp. 14-15). The IHO rejected M.A.'s argument that W.A. should remain in a CTT classroom, concluding that a special class in a specialized school was best suited to address W.A.'s PDD and to accommodate her wheelchair needs. (Id. at Ex. J p. 14). The IHO also determined that M.A. was not entitled to reimbursement for the ABA services that she had privately secured for W.A. (Id.).

M.A. subsequently appealed the IHO's decision to the New York State Education Department's Office of State Review,

12

arguing that the IHO had erred (1) in concluding that W.A.
should be assigned to a special class in a specialized school,
rather than receiving supplemental ABA services in the context
of a less-restrictive CTT class, and (2) in denying M.A.
reimbursement for W.A.'s private ABA sessions. (See id. at Ex. A
p. 11). In a decision dated October 19, 2009, the SRO concluded
that the CTT classroom setting was inappropriate for W.A., but
held that M.A. was entitled to reimbursement for the private ABA
services that W.A. had received during the 2008-to-2009 school
year. (Id. at Ex. A p. 16).


### 2. Events Involving Defendant Elizabeth McFadden

In late September 2008, shortly after the start of W.A.'s
first-grade year, the Department of Education assigned
paraprofessional Elizabeth McFadden to the Manhattan School for
Children. (Id. at Ex. K, Ex. L). Ms. McFadden had approximately
ten years of paraprofessional experience at that time, including
experience working with disabled and special-needs children.
(Walsh Decl. Ex. B pp. 7-10). Principal Susan Rappaport assigned
Ms. McFadden to W.A.'s first grade CTT classroom, as one of a
team of four or five paraprofessionals. (Conway Decl. Ex. B p.
38, Ex. E p. 53).

13

In about October 2008, Ms. McFadden began working with W.A. as her primary paraprofessional.[5] (Id. at Ex. N p. 19). Staff from the school report that they began to notice that Ms. McFadden lacked initiative and did not work collaboratively as a member of the classroom team. (See, e.g., id. at Ex. B p. 38, Ex. E p. 89, Ex. P; Walsh Decl. Ex. K p. 892). There were reports that she chewed gum and would answer her phone or look at magazines while working. (See, e.g., Conway Decl. Ex. P. 892). On at least one occasion, Ms. McFadden improperly fed W.A. food other than the special food that her mother had sent for her from home. (See Walsh Decl. Ex. B p. 27-28, Ex. D pp. 45-46, 68). In addition, Ms. McFadden apparently had difficulties properly changing W.A.'s diaper (see Conway Decl. Ex. N pp. 62-64), and M.A. reported that W.A. would frequently arrive home from school in urine soaked clothes. (Walsh Decl. Ex. B pp. 31-32; Conway Decl. Ex. F pp. 31, 40. But see Conway Decl. Ex. E

---

[5] We note that, in the complaint, plaintiffs initially alleged that Ms. McFadden was assigned to work with W.A. in place of W.A.'s previously-assigned paraprofessional, Diana Gonzalez, purportedly because Principal Rappaport and Assistant Principal Cassan-Jellison wanted to avoid the possibility of losing Ms. Gonzalez if W.A. were to be reassigned to a specialized school pursuant to her newly-proposed IEP. (See Compl. 7). However, the record indicates that, in fact, Ms. McFadden was assigned by the DOE to an opening at the Manhattan School for Children following downsizing at another school. (Walsh Decl. Ex. D p. 90; Conway Decl. Ex. B pp. 24-25, Ex. D p. 20, Ex. E p. 52, Ex. K, Ex. L). There is no evidence to support plaintiffs' assertion that W.A.'s paraprofessional was reassigned in bad faith.

14

pp. 89-90 (noting that W.A. had diaper leaks unrelated to Ms. McFadden because the diapers sent from home were too small for W.A.)). M.A. also reported that W.A. arrived home on the school bus one afternoon with her safety harness unfastened, but it is unclear whether this occurrence is attributable to Ms. McFadden. (See Conway Decl. Ex. F. pp. 29-30, Ex. N 67-68; Walsh Decl. Ex. D p. 76).

The bulk of plaintiffs' claims turn on an incident that took place on November 20, 2008. During class, Ms. Choi and paraprofessional Diana Gonzalez observed Ms. McFadden take hold of W.A.'s ponytail and pull W.A. from a leaning position in her stander to a full-standing position. (See Conway Decl. Ex. D p. 13). Although W.A. apparently did not cry out or give any indication that she had been injured (see id. at Ex. N pp. 81-82), W.A.'s teachers were sufficiently upset by what they perceived as callous handling of W.A. that Ms. Choi and Ms. Demetrius reported the incident to Principal Rappaport later that day.[6] (Id. at Ex. E p. 78, Ex. N pp. 57-58). At Ms. Rapport's request, the teachers prepared and submitted to her a

---

[6] November 20, 2008 was apparently a half-day at the Manhattan School for Children. (City Defs.' R. 56.1 Statement ¶ 58; Pls.' Am. R. 56.1 Statement ¶ 58).

written report detailing the incident. (Id. at Ex. B p. 41, Ex. E p. 74). In their report, the teachers stated that

> While this hair-pulling incident is the clearest example of physical abuse by Elizabeth, verbal abuse and 'manhandling' has been reported by other paras who accompany [W.A.] to the bathroom for changing. Changing has become so aversive… that she starts to scream when Elizabeth moves her towards the bathroom (a new behavior) and continues to scream during the changing… It has been reported that Elizabeth is rough with [W.A.], pulls her off the table by grabbing one arm, lets her drop back into the chair roughly and tells her to 'Shut up' and the like.

(Id. at Ex. Q; cf. id. at Ex. E p. 78 ("I worded it as strongly as possible because I wanted this woman out of the DOE.")). The report also expressed concern about Ms. McFadden's method of fastening W.A.'s diapers and moving her wheelchair, as well as Ms. McFadden's refusal to sing to W.A. to soothe her. (Id. at Ex. Q). In their deposition testimonies, Ms. Choi and Ms. Demetrius indicated that such conduct had not initially struck them as particularly concerning because it was not atypical for a new paraprofessional to experience some difficulties when getting accustomed to working with a child, and in several instances they had not directly witnessed the conduct that was reported to them by other paraprofessionals in the room. They

16

indicated, however, that following the hair-pulling incident, their initial uncertainty had developed into genuine concern that Ms. McFadden should be removed from the classroom. (Id. at Ex. N pp. 54-57, 62-68, Ex. D pp. 72-73).

In light of the apparently serious allegations against Ms. McFadden, Principal Rappaport promptly removed Ms. McFadden from the CTT classroom.[7] Ms. Rappaport also contacted the DOE's Emergency Information Center, and submitted an allegation of corporal punishment to the DOE's Office of Special Investigations ("OSI"). (Id. at Ex. B pp. 41-43). The OSI directed Ms. Rappaport to conduct an investigation into the alleged incident. (Id. at Ex. B p. 42, Ex. R). Ms. Rappaport interviewed the two eye-witnesses to the incident, Diana Gonzalez and Katrina Choi. (Id. at Ex. D p. 14, Ex. N p. 55). She then met with Ms. McFadden, who was accompanied by a union representative (id. at Ex. B p. 43), and, at Ms. McFadden's request, she obtained a written statement from another paraprofessional in the class, Drew Debarros, who indicated that he had not witnessed the event. (Id. at Ex. B p. 49). Principal

_____

[7] There is some ambiguity in the record as to whether Ms. McFadden was removed the day after the incident, on November 21, 2008, or soon thereafter. (Compare Conway Decl. Ex. B p. 43, Ex. D p. 42, Ex. E p. 93, Ex. N p. 56, and Walsh Decl. Ex. D p. 25 with Conway Decl. Ex. S and Walsh Decl. Ex. B p. 41-44).

Rappaport also met with M.A. on or about November 25, 2008, to inform her of what had taken place and of the fact that an investigation was underway. (Id. at Ex. B p. 47; see id. at Ex. V). At the end of her investigation, Ms. Rappaport reported to OSI that she had concluded that the alleged hair-pulling incident had indeed occurred, and on December 22, 2009 she fired Ms. McFadden from her employment with the DOE.[8] (Id. at Ex. Y).

## PROCEDUAL HISTORY

Plaintiffs filed this lawsuit on May 4, 2010, asserting various federal and state-law claims. They named as defendants the New York City Department of Education ("DOE"), Mayor Michael

---

[8] We have excluded from our factual summary certain allegations that are not supported by the evidence that plaintiffs cite. For example, plaintiffs allege that Ms. McFadden fed W.A. "nauseating" combinations of food "such as stew and pudding." (Pls.' Opp'n to Summ. J. Mot. 4). However, the evidence that they point to is non-corroborative. First, they point to a November 3, 2008 letter of reprimand from the assistant principal to Ms. McFadden that makes no mention of feeding practices. (Id. (citing Walsh Decl. Ex. H p. 49); see Walsh Decl. Ex. A p. 1; Conway Decl. Ex. B p. 57). Second, they point to hearsay testimony by M.A. concerning events allegedly reported to her by Rebecca Yure, the private ABA provider who occasionally worked with W.A. in her CTT classroom. (Pls.' Opp'n to Summ. J. Mot. 4 (citing Walsh Decl. Ex. N); see Conway Decl Ex. F pp. 24-25; Walsh Decl. Ex. K pp. 816-957); see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (nonmovant "cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial.").

Bloomberg (in his official capacity only), former Chancellor of the DOE Joel Klein (in his official capacity only), Susan Rappaport, principal of the Manhattan School for Children (in her official capacity only), Claudine Cassan-Jellison, assistant principal of the Manhattan School for Children (in her official capacity only), teachers Katrina Choi and Gina Demetrious (in their individual and official capacities), and former paraprofessional Elizabeth McFadden (in her individual and official capacities). (Compl. 4-5).

Plaintiffs assert six claims, none under the IDEA. First, they argue that the DOE and defendants Katrina Choi, Gina Demetrious, Elizabeth McFadden "and/or other NYCDOE employees" impermissibly excluded W.A. from activities, such as music class, and denied her beneficial services because of her disability, in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and § 202 of the ADA, 42 U.S.C. § 12132. (Id. at 13-14). Second, plaintiffs allege that defendants engaged in "prohibited interference, coercion, and/or intimidation" to retaliate against M.A. for her advocacy through the IEP appeals process. (Id. at 15; see Pls.' Summ. J. Opp'n Mem. 10-11). Third, plaintiffs argue that defendants Katrina Choi, Gina Demetrious, Elizabeth McFadden, "and/or other NYCDOE employees"

19

intentionally inflicted emotional harm on W.A. (Compl. 16). They also allege that the DOE is vicariously liable for such conduct. (Id.). Fourth, plaintiffs allege that Elizabeth McFadden assaulted and battered W.A. and that the DOE is also vicariously liable for that conduct. (Id.). Fifth, plaintiffs allege that the DOE was negligent in training and supervising Ms. McFadden. Lastly, plaintiffs assert that defendants Katrina Choi, Gina Demetrious, Claudine Cassan-Jellison and Susan Rappaport failed to report suspected child abuse by Ms. McFadden to Child Protective Services ("CPS") or the Administration for Child Services ("ACS"). (See id. at 9-10).

Fact discovery in this case ended September 30, 2011 and the City defendants filed a motion for summary judgment on February 23, 2012.

## THE CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The City defendants first argue that plaintiffs failed to properly exhaust their federal claims. (City Defs.' Mem. of Law in Supp. of Summ. J. Mot. 3-7). They next assert that plaintiffs have failed to allege facts sufficient to state a claim for discrimination under either the ADA or the Rehabilitation Act.

(Id. at 7-10).[9] Although initially articulated as a challenge to the adequacy of the pleading, because plaintiffs do not allege bad faith, the City defendants' argument also rests on an assertion that there is no evidence that W.A. was excluded from mainstream educational activities, hence precluding the statutory claims. (Id. at 8-9). The individually-named City defendants go on to argue that they are entitled to qualified immunity from liability on plaintiffs' claims under the ADA and the Rehabilitation Act. (Id. at 10-11; City Defs.' Summ. J. Reply Mem. 7). With respect to alleged retaliation, the City defendants argue that M.A. has expressly admitted that none of the individually-named City defendants allowed W.A. to be abused by Ms. McFadden in retaliation for her administrative appeals of the IEP, and they assert that there is no other evidence to support such a claim. (City Defs.' Mem. of Law in Supp. of Summ. J. Mot. 9-10). They further argue that the evidence undisputedly shows that Ms. McFadden was properly trained and supervised, and that, following the hair-pulling incident, she was promptly reported and removed from the classroom. (Id. at 10).

---

[9] There is no dispute that W.A. qualifies as an individual with a disability under the ADA and the Rehabilitation Act. (See City Defs.' Mem. of Law in Supp. of Summ. J. Mot. 3-10; City Defs.' R. 56.1 Statement ¶¶ 1-3).

Based on their argument that all of plaintiffs' federal-law claims should be dismissed, the City defendants encourage the court not to exercise supplemental jurisdiction over plaintiffs' state-law claims. (Id. at 11-12). In the alternative, they argue that the state-law claims for intentional infliction of emotional distress, negligent training and supervision, and failure to report suspected child abuse should all be dismissed because those claims are not supported by the evidence. (Id. at 12-14; City Defs.' Summ. J. Reply Mem. 8).

ANALYSIS

## I. Standard of Review

Summary judgment will be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317,

22

322 (1986). In making this judgment, the court must view all evidence in the light most favorable to the non-moving party, Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). "[A]ll doubts as to the existence of a genuine issue for trial should be resolved against the moving party," Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988) (citing Celotex, 477 U.S. at 330 n.2), but "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[;] [f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248 (1986).

If the non-moving party has the burden of proof as to a particular issue, the movant may satisfy its initial burden by demonstrating the absence of evidence supporting an essential element of the non-moving party's claim. See, e.g., Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997); Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996). If the movant satisfies

23

its initial burden, the burden then shifts to the opposing party to demonstrate that there is a genuine dispute as to a material fact. See Celotex, 477 U.S. at 323; L & L Started Pullets, Inc. v. Gourdine, 762 F.2d 1, 4 (2d Cir. 1985). The non-movant may not simply rest on the allegations set forth in its pleading, but rather must submit "significant probative evidence tending to support" those allegations. Anderson, 477 U.S. at 249.


## II.  The City Defendants' Motion to Strike

On June 15, 2012, the City defendants moved to strike the Rule 56.1 Statement that plaintiffs had filed in opposition to the summary-judgment motion. They argued that

> each and every paragraph in that document
> that purports to controvert the facts set
> forth in City Defendants' 56.1 statement
> fails to provide a citation to evidence
> which would be admissible, as required by
> Local Civil Rule 56.1 and Fed. R. Civ. P.
> 56(c). Furter, those paragraphs that purport
> to add 'facts' universally rely on
> inadmissible hearsay or speculation, or are
> in no way supported by the portions of the
> record they cite.

(City Defs.' Mem. in Supp. of Mot. to Strike Pls.' 56.1 Statement 1-2).

In their June 28, 2012 response to the motion to strike,
plaintiffs submitted a proposed Amended Rule 56.1 Statement, to
which the City defendants again objected in their reply, arguing
that plaintiffs, in their amended statement, "purport to admit
only a portion of the facts asserted by the City Defendants, but
do not set forth a meaningful or material dispute to those
facts" (City Defs.' Reply in Supp. of Mot. to Strike Pls.' 56.1
Statement 2), "admit only a portion of the facts asserted, or
restate the facts asserted in a manner they prefer, implying
that they deny the facts that are not explicitly admitted or
restated" (id. at 3), "append affirmative statements to their
response, or cite to evidence, that is either irrelevant or non-
resposive, in either case not a basis to dispute the assertion"
(id. at 4), fail to point to contrary evidence, yet decline to
admit facts on the asserted ground that they lack sufficient
knowledge to do so (id. at 5), cite to evidence that does not
support their responses (id. at 6), and deny facts without
citation to admissible evidence. (Id.). We have reviewed these
arguments, as well as plaintiffs' responses, and we find
ourselves in agreement with many of the City defendants'
criticisms of both versions of plaintiffs' Rule 56.1 Statements.
Nevertheless, rather than dissect plaintiffs' Amended Rule 56.1
Statement paragraph by paragraph, we base our assessment of the

25

underlying summary-judgment motion primarily on the supporting evidence submitted by the parties. Accordingly, we deny the motion to strike.

## III. Exhaustion of Federal Claims Pursuant to the IDEA

### a. The Administrative Exhaustion Requirement

Before an aggrieved party files suit, the IDEA requires her to exhaust her administrative remedies for any federal claims related to the education of disabled children, if the "the issues raised… are those the IDEA is intended to remedy." Gardner v. Uniondale Pub. Sch. Dist., 2008 WL 4682442, *8 (E.D.N.Y. Oct. 21, 2008); see 20 U.S.C. § 1415(l); Polera, 288 F.3d at 481. This is true even if the plaintiff has not asserted any claims under the IDEA itself. See Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 247-49 (2d Cir. 2008).[10]

---

[10] Although the Second Circuit has expressed some equivocation in the wake of the Supreme Court's holdings in Kontrick v. Ryan, 540 U.S. 443 (2004), and Eberhart v. United States, 546 U.S. 12 (2005) (per curiam), as to whether the IDEA's exhaustion requirement should be viewed as a jurisdictional prerequisite or an affirmative defense, Coleman v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 203 (2d Cir. 2007); see Baldessarre v. Monroe-Woodbury Cent. Sch. Dist., 496 F. App'x 131, 133 n.3 (2d Cir. 2012), it has thus far declined to overturn its line of cases holding that failure to exhaust deprives federal courts of subject matter jurisdiction. See Baldessarre, 496 F. App'x at 133 (quoting Cave, 514 F.3d at

The relevant inquiry in determining whether a plaintiff was required to exhaust a claim under the IDEA is not the particular cause of action asserted or the remedy sought by the plaintiff, but rather the "'[t]he theory behind the grievance.'" Polera, 288 F.3d at 488 (quoting Charlie F. v. Bd. Of Educ. Of Skokie Sch. Dist., 98 F.3d 989 (7th Cir. 1996)); see M.C. v. Arlington Cent. Sch. Dist., 2012 WL 3020087, *8 (S.D.N.Y. July 24, 2012) (quoting Cave, 514 F.3d at 245 n.2). If the conduct or conditions a plaintiff complains of are the type that the IDEA was intended to remedy -- that is, related to the educational program and accommodations of a disabled child -- administrative remedies must be exhausted prior to filing suit in court. See 20 U.S.C. § 1400; Kalliope R. ex rel. Irene D. v. New York State Dep't of Educ., 827 F. Supp. 2d 130, 137 (E.D.N.Y. 2010).

    As the Second Circuit has noted,

> [t]he IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and

---

245); Coleman, 503 F.3d at 204; B.M. v. NYC Dep't of Educ., 2013 WL 1972144, *6 (S.D.N.Y. May 14, 2013). In any event, where, as here, there is no question that defendants have properly raised the exhaustion argument, the distinction is immaterial. Baldessarre, 496 F. App'x at 133 n.3; Coleman v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 204 (2d Cir. 2007).

> promptly resolve grievances. The exhaustion
> requirement 'prevents courts from
> undermining the administrative process and
> permits an agency to bring its expertise to
> bear on a problem as well as correct its own
> mistakes.'"

Polera, 288 F.3d at 487 (quoting Heldman ex rel. T.H. v. Sobol,

962 F.2d 148, 159 (2d Cir. 1992)). Even "[i]f the administrative

process is not successful at resolving the dispute, it will at

least have produced a helpful record because administrators

versed in the relevant issues were able to probe and illuminate

those issues for the federal court." J.S. ex rel. N.S. v. Attica

Cent. Sch., 386 F.3d 107, 112-13 (2d Cir. 2004).


In limited circumstances, exhaustion under the IDEA may be

excused if a plaintiff can show that pursuing administrative

remedies would have been futile. Coleman, 503 F.3d at 205. "To

show futility, a plaintiff must demonstrate that 'adequate

remedies are not reasonably available' or that 'the wrongs

alleged could not or would not have been corrected by resort to

the administrative hearing process.'" Id. (quoting J.G. v. Bd.

of Educ. of Rochester City Sch. Dist., 830 F.2d 444, 447 (2d

Cir. 1987)). For example, failure to exhaust may be excused if

the administrative process is "so structurally tainted that

[plaintiffs] would not have been afforded a fair and impartial

28

forum to present their claims." Cave, 514 F.3d at 250. Similarly, exhaustion is not required if the dispute exclusively involves a failure to implement an adequately-developed IEP, such that further administrative review of the IEP would not address the problem, see Polera, 288 F.3d at 489, or where the issue complained of is beyond the power of school administrators to remedy. J.S., 386 F.3d at 113 (citing generally Heldman, 962 F.2d 148).

Regardless of the fact that plaintiffs have not asserted any claims under the IDEA, their ADA and the Rehabilitation Act claims will be barred from review by this court if (1) the issues complained of are the type that the IDEA was intended to remedy, and (2) failure to exhaust is not otherwise excused.[11] See, e.g., Baldessarre v. Monroe-Woodbury Cent. Sch. Dist., 820 F. Supp. 2d 490, 504-09 (S.D.N.Y. 2011), aff'd, 496 F. App'x 131 (2d Cir. 2012).

### b. Was Exhaustion Required for Plaintiff's Federal Claims?

Plaintiffs assert that the defendants discriminated against W.A., in violation of the ADA and the Rehabilitation Act, by (1)

---

[11] The IDEA's exhaustion requirement does not apply to plaintiffs' state-law claims. See 20 U.S.C. § 1415(l).

preventing W.A. from participating in certain mainstreaming educational opportunities, such as music class, (2) removing her to the hallway for separate instruction, apart from her classmates, and (3) denying her access to her assistive communicative device. (See Compl. 13-14; Pls. Opp'n Mem. 9). Plaintiffs also vaguely suggest that, because of W.A.'s disability, defendants sought to push W.A. out of the Manhattan School for Children and, in anticipation of her departure, began to withdraw educational benefits, most notably by assigning an allegedly inadequate paraprofessional, defendant McFadden, to work with W.A. (Compl. 6-7; see also Walsh Decl. Ex. J p. 647).

Plaintiffs further allege that, in violation of the ADA, the City defendants retaliated against M.A. for her advocacy in support of W.A.'s special education needs, by (1) failing to provide W.A. educational opportunities that were afforded to her non-disabled peers; (2) predetermining the results of W.A.'s September 2008 CSE meeting; (3) subjecting W.A. to general mistreatment; (4) failing to report suspected child abuse by defendant McFadden to the Administration for Child Services or Child Protective Services; and (5) failing to provide M.A. with detailed information about defendant Elizabeth McFadden and the

30

outcome of the school's investigation into McFadden's alleged abuse of W.A. (Compl. 12).

Plaintiffs do not contest that they failed to administratively exhaust their federal claims. (See Pls.' Summ. J. Opp'n Mem. 11-13). Instead, they argue that none of their claims are subject to the IDEA exhaustion requirement in the first place and that, in any event, their non-exhaustion should be excused based on the emergence of new facts during the administrative process and the futility of the administrative remedy. (Id.).

With the exception of plaintiffs' retaliation claims that are premised on abuse and failure to report abuse, all of plaintiffs' federal discrimination and retaliation claims concern the adequacy of the educational services that were afforded to W.A. at the Manhattan School for Children and/or plaintiffs' procedural rights under the IDEA. Specifically, their claims that W.A. was removed to the hallway for separate instruction and was excluded from music class relate to the appropriate level of mainstreaming. Similarly, their claims that W.A. was sometimes denied access to her assistive communicative device in the classroom, and that her preferred paraprofessional

31

had been replaced by another paraprofessional relate to how her special educational needs were to be properly accommodated by the school. These are precisely the type of issues that the IDEA is intended to address, see 20 U.S.C. § 1415(b)(6)(A) (enabling parents to file complaints about "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child"), and which school administrators, in collaboration with parents, are best equipped to address in the first instance. See Polera, 288 F.3d at 487. The fact that plaintiffs are seeking relief that is not available under the IDEA -- namely, declaratory relief and compensatory and punitive damages (Compl. at 17-18) -- is of no moment, given that the IDEA process presumably could have provided plaintiffs with full, adequate relief, for example by developing a plan to better integrate W.A. into the classroom and ensure her access to her assistive communication device, or by finding a more appropriate educational placement to meet W.A.'s specific needs. See Polera, 288 F.3d at 488 (finding "instructive" the Seventh Circuit's conclusion in Charlie F. v. Bd. of Educ. of Skokie Sch. Dist., 98 F.3d at 992, that adequate relief under the IDEA is "relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the

32

person prefers."); see also Baldessarre, 820 F. Supp. 2d at 506 ("[T]he proper inquiry in assessing whether exhaustion was required is not whether actual discrimination occurred in the classroom; instead, it is whether the administrative process could have provided Plaintiffs with adequate relief at the time the alleged wrong occurred.").

Plaintiffs' claim that the September 2008 CSE meeting was, in essence, perfunctory and that its results were predetermined (Compl. 12) is also the type of issue that the IDEA's administrative appeals process is specifically designed to remedy. The IDEA specifically ensures that decisions by local school districts and the IHOs that they appoint are subject to outside review by state administrators. 20 U.S.C. § 1415(g). Here, because "plaintiffs allege that it was the District, not the state," that purportedly denied them a fair hearing at the CSE meeting, "a full remedy through the state administrative process was available to the plaintiffs," and they were "first required to seek redress at the state administrative level prior to filing suit." Dallas v. Roosevelt Union Free Sch. Dist., 644 F. Supp. 2d 287, 295 (E.D.N.Y. 2009); cf. Cave, 514 F.3d at 249 ("Absent any evidence casting doubt on the impartiality of the local or the state review officers who would examine appellants'

33

claims, we cannot presume that they would be biased."). Because plaintiffs did not argue to the IHO or the SRO that they had been denied their due-process rights at the CSE meeting, they are precluded from proceeding on that claim here.

Plaintiffs also claim that the DOE retaliated against M.A. by withholding information concerning its investigation into the reported abuse by Ms. McFadden. During the IHO hearing, plaintiffs asserted that disclosure of the DOE's investigatory report was essential to the IEP-review process because it could help to explain why W.A. may have failed to adequately progress in her first-grade year, and could help to determine whether the CTT-classroom setting might be appropriate absent such abuse. (See Walsh Decl. Ex. J pp. 566-67, 762-84, Ex. K pp. 786-98). Thus, plaintiffs explicitly argued that the relief they sought was covered by the IDEA. However, plaintiffs did not argue, as they apparently do now, that the DOE's non-disclosure of its investigatory report amounted to retaliation, nor did they apparently reassert their claim concerning non-disclosure in their appeal to the SRO. (See generally Walsh Decl. Ex. P). As a result, the claim is unexhausted. See Dallas, 644 F. Supp. 2d at 295; B.M., 2013 WL 1972144, at *6 (claim in administrative forum should put defendants on notice of nature of claim); P. v.

34

Greenwich Bd. of Educ., 2013 WL 1007204, *10 (D. Conn. Mar. 14, 2013) (failure to articulate discrimination claim, despite having argued the factual basis for that claim in the administrative forum, constitutes a failure to exhaust).

As for plaintiffs' claims that the City defendants physically and emotionally mistreated W.A., exposed her to abuse at the hands of defendant McFadden, and failed to report such abuse in supposed retaliation for M.A.'s advocacy under the IDEA, we conclude that such alleged conduct is not the sort that the IDEA was designed to address. We agree with plaintiffs that "[p]hysical and emotional abuse by school district personnel" does not constitute the type of educational deficiency that the IDEA is intended to address, but rather is "a completely separate actionable wrong." (Pls.' Summ. J. Opp'n Mem. 13); see Polera, 288 F.3d at 490 (discussing Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912 (6th Cir. 2000), in which disabled student had been "locked in a small, dark, unheated, unventilated cell for long periods of time as a disciplinary measure."). The purpose of the IDEA is to address the unique educational needs of disabled students, not to protect those students from physical abuse by educators or to ensure that educators comply with their legal obligation to report suspected instances of

35

child abuse. Accordingly, plaintiffs were not required by the IDEA to exhaust those retaliation claims that are premised on defendants' allegedly tortious conduct.

### c. Is Plaintiffs' Failure to Exhaust Excused?

Plaintiffs argue that for those claims deemed subject to the IDEA's exhaustion requirement, their failure to exhaust should be excused for several reasons. First, they argue that "[t]he facts in the instant action became known during the IDEA due process case." (Pls.' Summ. J. Opp'n Mem. 12) (emphasis in original). However, they cite no caselaw in support of the legal premise for this argument -- that claims grounded in facts learned during the administrative process need not be raise at that stage. See Cave, 514 F.3d at 249 ("party seeking to avoid exhaustion bears the burden of showing futility"). The pertinent consideration is whether, as a practical matter, the plaintiff had a reasonable opportunity to raise the claim administratively and have it addressed. See Polera, 288 F.3d at 487. In this case, M.A. learned of the hair-pulling incident and related concerns about Ms. McFadden's treatment of W.A. by the end of November 2008, before the commencement of the IHO hearing. (See, e.g., Walsh Decl. Ex. L; Conway Decl. Ex. J). Under the

36

circumstances alleged, we see no reason why plaintiffs could not have sought leave to add new claims at that time. See 20 U.S.C. § 1415(f)(3)(B) (new issues may be raised at due process hearing that were not raised in the notice, if the other party agrees); B.M., 2013 WL 1972144, at *5; cf. Polera, 288 F.3d at 490 ("plaintiffs… should not be permitted to 'sit on' live claims and spurn the administrative process that could provide the educational services they seek, then later sue for damages.").

Plaintiffs also argue that exhaustion of administrative remedies would have been futile. First, they assert that it would have been futile for them to have pursued administrative remedies because the City defendants acted in violation of the law "through their discrimination of, and retaliation against, W.A., as well as through their inaction in the face of her abuse at the hands of her assigned paraprofessional." (See Pls.' Summ. J. Opp'n Mem. 13). Plaintiffs base this argument on language in Cave v. East Meadow Union Free School District, stating that "the exhaustion requirement does not apply 'when pursuit of the administrative remedies would be futile because the agency [] was acting in violation of the law.'" 514 F.3d at 249 (quoting Heldman, 962 F.2d at 159). That language, appearing in the context of the Second Circuit's broader discussion of futility,

37

clearly refers to a much narrower category of violations than plaintiffs apparently believe, namely to legal violations that render the administrative review process ineffective. For example, obstructing parents' access to or knowledge of the IDEA review process could satisfy the futility exception. See Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 149 (2d Cir. 2002); B.D. v. DeBuono, 130 F. Supp. 2d 401, 428 (S.D.N.Y. 2000). In marked contrast, plaintiff's suggestion that any alleged legal violation can serve to excuse exhaustion under the IDEA, regardless of the potential impact of the violation on the administrative review process, would, in effect, gut the exhaustion requirement entirely, and would allow every plaintiff to proceed directly to state or federal court on any IDEA-related claim, whether or not that claim had been exhausted. That plainly is not the law in this or any other circuit. Given that plaintiffs have not alleged, much less demonstrated, that defendants committed any legal violation that rendered the administrative process ineffective, we conclude that their futility argument premised on alleged legal violations by the defendants must fail.

Second, plaintiffs assert futility premised on what they characterize as "systemic" problems in the DOE's handling of

38

disabled students' educational needs. (See Pls.' Summ. J. Opp'n Mem. 14). We note, however, that in their complaint plaintiffs made no mention of any systemic problems or of any conduct by the defendants directed toward anyone other than plaintiffs. (See generally Compl.). They also have provided no evidence that might support such a claim. (See generally Walsh Decl.). Their conclusory invocation of systemic violations is therefore unavailing. See Levine v. Greece Cent. Sch. Dist., 353 F. App'x 461, 465 (2d Cir. 2009).

Plaintiffs' last argument with respect to futility is that the DOE was unable to provide adequate relief for the retaliation, discrimination, or tort claims. (Pls.' Summ. J. Opp'n Mem. 14). As we indicated above, the IDEA administrative review process clearly could have provided an adequate remedy with respect to plaintiffs' claims involving W.A.'s class placement, the educational resources available to her (including her assigned paraprofessional and her assistive communication device), and her level of integration into the mainstream classroom, since the school or the DOE could have directly implemented any necessary adjustments to her educational program. Contrast Heldman, 962 F.2d at 159 (plaintiff's claim that state procedure for the selection of hearing officers

39

violated IDEA could not be adequately remedied where hearing officer and commissioner of education lacked the power to modify governing state legislation).

Finally, we note that plaintiffs argued before the IHO that the DOE should be required to turn over information concerning its internal investigation of the hair-pulling incident, and that when the IHO directed that the DOE comply with its subpoena, the DOE refused to do so. (See Walsh Decl. Ex. J pp. 566-67, 762-84, Ex. K pp. 786-98). However, there is no indication in the record that plaintiffs exhausted the non-disclosure issue before the SRO, nor have they suggested any reason why further resort to the administrative process on that issue would have been futile. Moreover, they fail to demonstrate that lack of access to the DOE's investigatory report about the hair-pulling incident precluded them from raising all relevant issues in the administrative process. Thus, they have failed to carry their burden of showing that exhaustion should be excused.

In sum, plaintiffs failed to exhaust administrative remedies with respect to their claims concerning (1) W.A.'s involvement in mainstream classroom activities and her removal to the hallway for separate instruction, (2) purported efforts

40

to remove services in anticipation of W.A.'s transfer to an alternate school, (3) the availability of her assistive communication device, (4) the sufficiency of the September 2008 CSE meeting, and (5) the DOE's initial non-disclosure of its internal investigatory report. Because they have also failed to show that an exception to the IDEA's exhaustion requirement applies to those claims, we recommend that each of those claims be dismissed for lack of exhaustion.[12] In view of our conclusion that this court lacks jurisdiction, we do not address the City defendants' arguments as to the merits of those claims.

As for plaintiffs' federal claims premised on tortious conduct, we have already noted that such claims are not subject to the IDEA exhaustion requirement in the first place.

---

[12] Although Ms. McFadden did not move for summary judgment, we recommend that the same claims be dismissed against her on the same basis. See Bridgeway Corp. v. Citibank, 201 F.3d 134, 139-40 (2d Cir. 2000) (prejudice associated with sua sponte grant of summary judgment is minimized if party against whom it is granted had notice and opportunity to defend against the arguments against it, or if "the party had no additional evidence to bring"); see also Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (federal courts have a duty to dismiss, sua sponte, claims over which they lack subject matter jurisdiction).

41

## IV.  The Merits of Plaintiffs' Surviving Federal Claims

As discussed above, we conclude that plaintiffs' retaliation claims premised on abuse and the failure to report abuse are not subject to the IDEA's exhaustion requirement. We now address the merits of each of these retaliation claims.

ADA retaliation claims are analyzed under a three-stage burden-shifting framework. Plaintiffs must initially establish a prima facie case of retaliation by showing that: (1) they engaged in an activity protected by the ADA; (2) the defendants were aware of this activity; (3) the defendants took adverse action against plaintiffs; and (4) a causal connection exists between the alleged adverse action and the protected activity. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Weixel, 287 F.3d at 148. If plaintiffs establish a prima facie case, the burden shifts to defendants to articulate a legitimate, non-retaliatory reason for the allegedly adverse conduct, which plaintiffs must then rebut by pointing to evidence that would reasonably suggest that the defendants' proffered explanation is merely pretextual and that retaliatory animus was the motivating factor in the adverse action. Id. at 721.

Plaintiffs' advocacy efforts in the IDEA appeals process are undisputedly a protected activity. See Weixel, 287 F.3d at 149 (seeking reasonable educational accommodation for disability is protected under ADA); (see generally City Defs.' Mem. in Supp. of Summ. J; City Defs.' Reply). Nonetheless, plaintiffs have failed to establish a prima facie case because they are unable to show any retaliatory causal connection between defendants' allegedly adverse conduct and M.A.'s protected activity.

Plaintiffs' first remaining retaliation claim is that the City defendants purposely exposed W.A. to physical abuse by Ms. McFadden to retaliate against her mother for advocating in the IDEA appeals process. As an initial matter, we note that, in her deposition, plaintiff M.A. explicitly disavowed any belief that the City defendants had exposed W.A. to abuse in retaliation for her advocacy efforts. (Conway Decl. Ex. O pp. 53-54 ("I am not saying it was because I advocated on behalf of her, no, that's not what I'm saying. I am saying that they allowed my daughter to be abused. I have no idea why they did that.").

In any event, the record reflects no support for a retaliation theory. The evidence shows that Ms. McFadden was

43

assigned by the DOE to an opening at the Manhattan School for Children following a wave of department-wide layoffs and reorganization of staff in 2008. (See Conway Decl. Ex. B. at 28, Ex. L, Ex. K). At the time, she had approximately ten years of experience, including experience working with students with special needs. (Walsh Decl. Ex. B pp. 7-10). While Ms. McFadden's co-workers at the Manhattan School for Children indicated that they had developed some early concerns about her seeming lack of initiative and her occasionally uncooperative attitude (see, e.g., id. at Ex. B p. 30 ("she wasn't necessarily a very active participant in the classroom"); Ex. B p. 38 ("she would use her cell phone during instructional time"); Walsh Decl. Ex. K p. 892 ("I just saw basically a lack of involvement."), none of them indicated that they had any reason to suspect that she might become abusive. Moreover, plaintiffs have not presented any evidence remotely suggesting that the City defendants purposely placed W.A. in harm's way, much less that they did so to retaliate against plaintiffs. "[P]laintiffs have not put forward any proof to 'show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent.'" A.M. ex rel. J.M. v. NYC Dep't of Educ., 840 F. Supp. 2d 660, 687 (E.D.N.Y. 2012), aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.,

44

513 F. App'x 95 (2d Cir. 2013) (quoting Treglia, 313 F.3d at 720); Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion."). For this reason, their claim that the City defendants unlawfully retaliated against them by exposing W.A. to abuse should be dismissed with prejudice.

Plaintiffs' second remaining federal claim is that the City defendants opted not to report Ms. McFadden's physical mistreatment of W.A. to CPS or ACS in retaliation for M.A.'s advocacy in support of W.A.'s special educational needs. In essence, plaintiffs attempt to refashion a state-law claim for mandatory reporting into a federal retaliation claim. This effort fails for several reasons.

First, it is not at all clear that the City defendants' failure to report Ms. McFadden to ACS or CPS in fact amounted to an adverse action, within the meaning of the ADA. An adverse action must be "materially adverse," that is, "'harmful to the point that [it] could well dissuade," Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 90 (2d Cir. 2010) (quoting

45

Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010)), "'an individual of ordinary firmness'" from engaging in protected activity. Getso v. City Univ. of New York, 2009 WL 4042848, *5 (S.D.N.Y. Nov. 18, 2009) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006)).

Here, there is no dispute that Ms. Choi, Ms. Gonzalez, and Ms. Demetrius promptly reported the hair-pulling incident to the principal, Ms. Rappaport, that she promptly removed Ms. McFadden from the classroom, and that this action was followed by a swift investigation and the termination of Ms. McFadden. Under the circumstances, it is not surprising that plaintiffs do not allege that M.A. was intimidated by the absence of any report to CPS or ACS, and it is not at all apparent that the alleged failure to report to those entities would have dissuaded a person of ordinary firmness from advocating through the IEP-review process. Indeed, if anything, it seems likely that a parent learning of school officials' silence on such an issue would be roused to action, rather than quieted by official inaction.

Plaintiffs have also failed to show that the New York child-abuse reporting requirement was in fact triggered in this

case. See N.Y. Soc. Serv. §§ 413 (requiring school personnel,
among others, to report "when they have reasonable cause to
suspect that a child coming before them in their professional or
official capacity is an abused or maltreated child"), 412(1)
("abused child" is one who is abused as defined under family
court act[13]), 412(2) ("maltreated child" is one who is (a)
neglected, as defined by family court act,[14] or (b) "has had

---

[13] Abused child "means a child less than eighteen years of
age whose parent or other person legally responsible for his
care (i) inflicts or allows to be inflicted upon such child
physical injury by other than accidental means which causes or
creates a substantial risk of death, or serious or protracted
disfigurement, or protracted impairment of physical or emotional
health or protracted loss or impairment of the function of any
bodily organ, or (ii) creates or allows to be created a
substantial risk of physical injury to such child by other than
accidental means which would be likely to cause death or serious
or protracted disfigurement, or protracted impairment of
physical or emotional health or protracted loss or impairment of
the function of any bodily organ, or (iii) commits, or allows to
be committed" a sex offense against a child, "allows, permits or
encourages such child to engage in" prostitution, commits
incest, or allows such child to engage in sexual acts
criminalized under Article 263 of the Penal Law. N.Y. Fam. Ct.
Act § 1012.

[14] Neglected child "means a child less than eighteen years
of age (i) whose physical, mental or emotional condition has
been impaired or is in imminent danger of becoming impaired as a
result of the failure of his parent or other person legally
responsible for his care to exercise a minimum degree of care
(A) in supplying the child with adequate food, clothing, shelter
or education in accordance with the provisions of part one of
article sixty-five of the education law… or (B) in providing the
child with proper supervision or guardianship, by unreasonably
inflicting or allowing to be inflicted harm, or a substantial
risk thereof, including the infliction of excessive corporal
punishment; or by misusing a drug or drugs; or by misusing
alcoholic beverages to the extent that he loses self-control of

serious physical injury inflicted upon him or her by other than accidental means"). Declining to report child abuse when it is not at all clear that, within the meaning of the mandatory-reporting law, any abuse or maltreatment has occurred, can hardly be deemed to be an adverse, retaliatory action. This is particularly true when other affirmative steps have been taken to prevent future harm to the child, as was done here by promptly removing Ms. McFadden from the classroom and firing her.

Because plaintiffs have failed to show any retaliatory causal connection between the City defendants' decision not to report to CPS or ACS and plaintiffs' protected activity, we conclude that plaintiffs have failed to establish a prima facie case of retaliation under the ADA,[15] and we recommend that the claim be dismissed with prejudice.[16]

---

his actions; or by any other acts of a similarly serious nature requiring the aid of the court… or (ii) who has been abandoned… by his parents or other person legally responsible for his care." N.Y. Fam. Ct. Act § 1012 (emphasis added).

[15] Based on our determination that plaintiffs have failed to establish liability, we do not address the individual City defendants' argument that they are entitled to qualified immunity.

[16] We further recommend that the federal retaliation claims against Ms. McFadden be dismissed, notwithstanding the fact that she did not move for summary judgment. In opposing the City defendants' motion for summary judgment, plaintiffs have had

## V. Supplemental Jurisdiction Over Plaintiffs' State Law Claims

In addition to plaintiffs' federal discrimination and retaliation claims, they have asserted state-law claims of assault and battery, failure to report suspected child abuse, negligent training and supervision of school personnel, and intentional infliction of emotional harm. Defendants urge dismissal of those claims either through the court's authority to decline to exercise supplemental jurisdiction or on the merits.

As the Second Circuit has noted, "'[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.'" N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc., 497 F.3d 109, 119 (2d Cir. 2007) (quoting Marcus v. AT&T Co., 138 F.3d 46, 57 (2d Cir. 1998)); see United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726

---

notice of the arguments against their retaliation claims and a full opportunity to present evidence and legal theories that might support those claims, yet they have failed to carry their burden of proof as to those claims. Under the circumstances, a sua sponte grant of summary judgment is appropriate. See Bridgeway Corp., 201 F.3d at 139-40.

We note that, irrespective of the evidentiary record before us, it is doubtful that plaintiffs' retaliation claims were adequately pleaded to survive even a motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007) (claim must be "plausible on its face"). This, too, weighs in favor of dismissal of the claims.

(1966). In light of our recommendation that all of plaintiffs'
federal-law claims should be dismissed either for lack of
exhaustion or on the merits, we further recommend that the court
dismiss plaintiffs' state-law claims without prejudice to their
refiling in state court. See Cave, 514 F.3d at 250.


                              CONCLUSION


        For  the  reasons  discussed  above,  we  deny  the  City
defendants'  motion  to  strike  but  recommend  that  plaintiffs'
federal-law  claims  be  dismissed  with  prejudice  and  that
plaintiffs' state-law claims be dismissed without prejudice.


        Pursuant  to  Rule  72  of  the  Federal  Rules  of  Civil
Procedure,  the  parties  shall  have  fourteen  (14)  days  from  this
date  to  file  written  objections  to  this  Report  and
Recommendation. Such objections shall be filed with the Clerk of
the Court and served on all adversaries, with extra copies to be
delivered  to  the  chambers  of  the  Honorable  Deborah  A.  Batts,
Room 2510, 500 Pearl Street, New York, New York, 10007-1312, and
to the undersigned, Room 1670, 500 Pearl Street, New York, New
York,  10007-1312.  Failure  to  file  timely  objections  may
constitute a waiver of those objections, both in the District

                                 50

Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y. of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).


Dated: New York, New York
       September 5, 2013



_____
     MICHAEL H. DOLINGER
     UNITED STATES MAGISTRATE JUDGE




Copies of this Report & Recommendation are being sent today to:

Tracey Spencer Walsh, Esq.
Gary S. Mayerson, Esq.
Mayerson and Associates
330 West 38th Street, Suite 600
New York, NY 10018

Andrew J. Rauchberg, Esq.
Kimberly Dorothy Conway, Esq.
New York City Law Department, Corporation Counsel
100 Church Street
New York, NY 10007